1

2

3

4

5

6

7

8

9

10

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

11   DENNIS E. WALKER,                                          CASE NO. 02CV1747 WQH (JMA)

12                          Plaintiff / Counterdefendant,       FINDINGS OF FACT AND
                    vs.                                         CONCLUSIONS OF LAW
13                                                              FOLLOWING BENCH TRIAL
     MICHAEL W. CROW and RICHARD
14   KEYES,

15                  Defendants / Counterclaimants.

16

17   HAYES, Judge:

18          The matter before the Court is the Findings of Fact and Conclusions of Law pursuant to Rule

19   52(a) of the Federal Rules of Civil Procedure in this action tried without a jury.

20                                    **PROCEDURAL BACKGROUND**

21          On September 3, 2002, Plaintiff Dennis E. Walker (Walker) filed the Complaint in this matter

22   seeking contribution pursuant to 26 U.S.C. § 6672(d) against Defendants Michael W. Crow (Crow)

23   and Richard Keyes (Keyes).  (Doc. # 1).  On October 18, 2002, Keyes answered the Complaint and

24   asserted affirmative defenses premised upon agreements whereby Walker allegedly released all claims

25   of contribution against Crow and Keyes.  (Doc. # 4).  Keyes also filed Counterclaims against Walker

26   for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, and

27   declaratory relief.  (Doc. # 5).  The agreements referred to in Keyes' Answer and Counterclaims are

28   known to the parties as the First and Second Agreements, and were signed by all parties on May 1,

1    1997 (First Agreement), and on January 17, 2002 (Second Agreement).

2          On November 14, 2002, Walker answered Keyes' Counterclaims and asserted that the release

3    and indemnity provisions of the First and Second Agreements were void as against public policy.

4    (Doc. # 9).

5          On October 31, 2003, Crow answered Walker's Complaint and filed a Counterclaim against

6    Walker seeking declaratory relief.   (Doc. # 22).   Like Keyes, Crow based his Answer and

7    Counterclaims on the existence of the First and Second Agreements whereby Walker allegedly

8    released and waived any claim to contribution.

9          On June 20, 2006, Crow and Keyes filed Amended Counterclaims.  (Docs. # 84, 85).  On

10   November 21, 2006, Walker answered the Amended Counterclaims.  (Docs. # 99, 100).

11         Walker's claim for contribution (Doc. # 1) and Crow and Keyes' Amended Counterclaims for

12   breach of contract, misrepresentation, fraud, and declaratory relief (Docs. # 84, 85) remain pending

13   before the Court. On July 10, 2007, and after determining that all claims before the Court were ready

14   for trial, the Court bifurcated the claims and set trial dates. (Docs. # 118, 119).  The Court ordered

15   a bench trial with respect to Walker's claim for contribution to begin on September 18, 2007, and a

16   jury trial with respect to the Amended Counterclaims to begin on December 4, 2007.  (Doc. # 118).

17         The bench trial with respect to Walker's claim for contribution pursuant to 26 U.S.C. § 6672(d)

18   began as scheduled on September 18, 2007, and concluded on September 20, 2007.  Based upon the

19   testimony and exhibits received into evidence at trial, and after full consideration of the legal

20   arguments of all parties, the Court issues the following Findings of Fact and Conclusions of Law

21   pursuant to FED. R. CIV. P. 52(a) with respect to Walker's claim for contribution.  *See* (Doc. # 1).

22                              **FINDINGS OF FACT**

23         On or about July 14, 1996, Walker, Crow, and Keyes, among others, formed a Nevada limited

24   liability company known as SBN, LLC for the purposes of entering into the business of telemarketing

25   long distance telephone services.  Keyes and Crow initially contributed $25,000 each to SBN, LLC,

26   and each received a 15% equity interest in SBN, LLC at that time.  Keyes and Crow each contributed

27   an additional $50,000 at a later date and received additional equity interests in SBN, LLC.  Walker

28   did not contribute cash to SBN, LLC at any time.  Rather, Walker contributed "sweat equity" to SBN,

LLC, including his experience with call centers and telemarketing, as well as his contacts and contracts with U.S. Long Distance (USLD). Transcript of Bench Trial, Volume 2A at 237. Walker also contributed the goodwill of Walker's company SBN, Inc. Walker received a 50% equity interest in SBN, LLC for his contributions.

On or about July 11, 1996, Walker, Crow, Keyes, and two additional investors in SBN, LLC, entered into and signed SBN, LLC's Operating Agreement (the Operating Agreement). The Operating Agreement named Walker, Crow, and Keyes as initial managers of SBN, LLC, and named Walker as the Chief Executive Officer (CEO). The Operating Agreement provided that:

> The ordinary and usual decisions concerning the business affairs for the Company shall be made by the Chief Executive Officer, which will be held by Walker. The Managers shall have the authority to act for, and on behalf of, the Company (SBN, LLC) for all matters not otherwise expressly reserved to the Members pursuant to paragraphs 7.11, 7.12, and 7.13 or otherwise reserved to the Members pursuant to the Act or as otherwise set forth herein.

Tr. Ex. 2 at 16 (§ 8.1). Walker, Crow, and Keyes intended the position of manager to be akin to a position as a member of a board of directors when they signed the Operating Agreement and formed SBN, LLC.

Walker, Crow, and Keyes each testified that SBN, LLC intended and anticipated Crow and Keyes to be passive investors of SBN, LLC. At the time that the parties formed SBN, LLC, Crow served as President of Zipsort and Chairman of California Cosmetics, and his positions with those companies engaged 100% of Crow's time. At the time that the parties formed SBN, LLC, the parties intended Walker to control and operate SBN, LLC on a day-to-day basis vis-a-vis his positions as CEO, Chief Financial Officer (CFO), President, and General Manager of SBN, LLC. Walker testified that his role in SBN, LLC was to locate a site for and build a call center, locate and train employees, equip all facilities, negotiate contracts with third parties, make sure contracts were being implemented, and generate profits for the company. Walker further testified that he worked twelve hours per day, five days per week, for SBN, LLC. Walker hired and supervised hundreds of SBN, LLC employees, and signed or stamped his signature on every payroll check during SBN, LLC's existence.

SBN, LLC began operations in and around July 1996, and at that time, Walker hired Bob Baran to serve as SBN, LLC's Controller. As Controller, Baran prepared financial statements and payroll tax information, and managed accounts receivable, accounts payable, and relationships with

1   vendors.  Walker supervised Baran at all times, and Baran reported to Walker.  Walker hired Baran

2   without consulting Crow and Keyes.  Crow and Keyes were not happy that Walker hired Baran

3   without first consulting them.

4          On September 30, 1996, SBN, LLC failed to pay previously withheld employee payroll taxes

5   to the IRS for the third quarter of 1996.  During the third quarter of 1996, Walker and Baran exercised

6   complete control over withholding employee payroll taxes and ensuring that SBN, LLC paid tax

7   liabilities.  Walker testified that he signed all tax returns for SBN, LLC.

8          In October, 1996, Walker contracted with Dialogic to provide services to SBN, LLC.  Walker's

9   wife, Helen Walker, owned Dialogic from October, 1996 until approximately November, 1997, and

10  SBN, LLC paid Dialogic roughly $100,000 per month during that time.  At the time that Walker first

11  contracted with Dialogic, neither Keyes nor Crow knew that Helen Walker owned Dialogic.

12         On December 31, 1996, SBN, LLC failed to pay previously withheld employee payroll taxes

13  to the IRS for the fourth quarter of 1996.  During the fourth quarter of 1996, Walker and Baran

14  exercised complete control over withholding employee payroll taxes and ensuring that SBN, LLC paid

15  tax liabilities.

16         Walker testified that he first learned that SBN, LLC had failed to pay tax liabilities for the third

17  and fourth quarters of 1996 during a meeting with Baran on or around January 11, 1997.  Walker fired

18  Baran during or after that meeting.  Though Walker testified that Baran unilaterally failed to pay

19  withholding taxes to the IRS, Walker testified that he directly supervised Baran during that time and

20  had ultimate responsibility for the payment of payroll taxes.  Neither Crow nor Keyes had any

21  responsibility for or authority to pay SBN, LLC's tax liabilities on or before January 11, 1997.

22         Crow and Keyes became aware of SBN, LLC's unpaid tax liabilities in and around the second

23  or third week of January, 1997.  In an effort to learn more about the tax liabilities and the financial

24  health of SBN, LLC, Crow and Keyes interviewed and hired an accountant and consultant named Tage

25  Tracy in late January, 1997.  Thereafter, Tracy submitted reports to Crow, Keyes, and Walker which

26  outlined SBN, LLC's dire financial state.

27         On February 11, 1997, Tracy submitted a report to the managers which informed the managers

28  that SBN, LLC had $350,000 in outstanding tax liabilities. Tr. Ex. 34.  On March 7, 1997, Tracy

1   submitted an additional report which further detailed SBN, LLC's outstanding tax liability.  In the

2   report of March 7, 1997, Tracy noted that, "[t]he company should stay current on paying all its payroll

3   tax liabilities associated with its weekly and bi-weekly payrolls starting with the payroll dated

4   2/28/97."  Tr. Ex. 35.  Tracy further noted that, "[t]he size of the federal (tax) obligation will prohibit

5   the company from undertaking a quick fix approach (i.e., immediately pay all outstanding balances

6   due)."  Tr. Ex. 35.  From and after March 7, 1997, SBN, LLC paid its payroll tax liability going

7   forward until on or about the fourth quarter of 1997.

8           Prior to late February or early March, 1997, Crow and Keyes were passive investors in SBN,

9   LLC, and each visited SBN, LLC's facilities, at most, two or three times per month.  Prior to late

10  February or early March, 1997, neither Crow nor Keyes hired or fired employees, paid creditors,

11  signed checks, withheld payroll taxes, paid payroll taxes, contacted creditors, contracted with third

12  party vendors, or provided any services to SBN, LLC other than as passive managers of the company.

13  Neither Crow nor Keyes ever had a permanent office at SBN, LLC's headquarters.

14          Prior to late February or early March, 1997, Walker completely controlled the day-to-day

15  operations and finances of SBN, LLC in his capacity as CEO, CFO, President, and General Manager.

16  Prior to late February or early March, 1997, Walker hired and fired employees, signed checks,

17  contracted with third party vendors, paid creditors, paid taxes, signed tax returns, and supervised and

18  operated the entire company.

19          In and around late February or early March, 1997, and after learning of SBN, LLC's

20  outstanding tax liabilities, Crow and Keyes began to take a more active role in the operation of SBN,

21  LLC.  At that time, Crow and Keyes attempted to restrict Walker's check-signing authority, and

22  participated in decisions to cut SBN, LLC's overhead by 50% and suspend training and hiring of

23  employees.  Crow and Keyes also participated in SBN, LLC's decision to terminate Walker's

24  employment contract, though Walker remained a manager and employee of SBN, LLC.  Tr. Ex. 27.

25  Walker resisted Crow and Keyes' efforts to restrict Walker's involvement in SBN, LLC, however,

26  Crow and Keyes believed those efforts were necessary in order to ensure the survival of the company.

27          As of February 25, 1997, SBN, LLC was insolvent.  Tr. Ex. 25.  On or around March 5, 1997,

28  Walker, Crow, and Keyes reorganized SBN, LLC, and each was assigned a 33.33% interest in the

1    company.  Tr. Ex. 28.

2         On March 31, 1997, SBN, LLC failed to pay previously withheld employee payroll taxes to

3    the IRS for the first quarter of 1997.  During the first quarter of 1997, Walker and/or Baran exercised

4    primary control over withholding and paying employee payroll taxes, but as of at least early March,

5    1997, Crow, Keyes, and Walker prioritized vendors as a group to determine who should be paid with

6    SBN, LLC's limited cash flow resources.

7         On or about May 1, 1997, SBN, LLC, Walker, and Crow, purchased Keyes' interest in SBN,

8    LLC for approximately $60,000.  Tr. Ex. 3.  As part of a non-competition agreement signed by all

9    parties contemporaneously with the contract to purchase Keyes' interest, SBN, LLC also transferred

10   to Keyes 22,500 un-vested USLD warrants.  The May 1, 1997, Agreement to purchase Keyes' interest

11   in SBN, LLC provided in pertinent part that,

12        SBN (LLC), WALKER, CROW AND PGT, further agree to indemnify and hold
          KEYES and/or the KEYES FAMILY TRUST harmless of and from any and all
13        actions, causes of action of every kind in law or equity, suits, debts, liens, contracts,
          agreements, promises, claims, liabilities, demands, damages, obligations, loss, costs
14        and expenses of any nature whatsoever, known or unknown, fixed or contingent,
          including, without limitation, reasonable attorneys' fees and court costs through and
15        including any and all appeals, taxable or otherwise, incurred as a result of the
          Outstanding Tax Liability or any other act of the Company or its members predating
16        this Agreement.

17        . . .

18        SBN, WALKER, CROW and PGT agree that KEYES and/or THE KEYES FAMILY
          TRUST are not "responsible persons" under applicable Internal Revenue Code
19        Sections, including but not limited to, Internal Revenue Code Section 6672, or
          corresponding provisions of prior Internal Revenue laws.  As such, neither KEYES
20        and/or THE KEYES FAMILY TRUST are liable for Federal Excise Taxes not turned
          over to the Government by SBN (LLC).
21
     Tr. Ex. 3 at 6-7.  The May 1, 1997, Agreement further included a global release, by which Keyes, the
22
     Keyes Family Trust, Walker, Crow, and SBN, LLC, each agreed to,
23
          release and forever discharge each other, their general partners, employees, agents,
24        representatives, successors, assigns, attorneys, accountants, and officers, of and from
          any and all claims, actions, causes of action of every kind in law and equity, suits,
25        debts, liens, contracts, agreements, obligations, promises, demands, liabilities,
          damages, loss, costs and expenses of any nature whatsoever, known or unknown, fixed
26        or contingent, real or imagined, in existence at the time of execution of this
          Agreement, arising from the formation, investment in, operation and management of
27        SBN (LLC).

28   Tr. Ex. 3 at 7.  After May 1, 1997, Keyes no longer had any interest in or involvement with SBN,

1  LLC.  After Keyes departed from SBN, LLC, Walker and Crow each owned a 50% interest in the
2  company.

3       In and around late April or early May, 1997, Walker and Crow signed reciprocal employment
4  agreements with SBN, LLC.  Sometime after May, 1997, and before October, 1997, Walker and Crow
5  caused SBN, LLC to distribute bonuses of $30,000 each to Walker and Crow.  In addition, Walker
6  received San Diego Padres season tickets and Crow received an additional $4,000 in cash.  At the time
7  that Walker and Crow caused the bonuses to be paid, SBN, LLC had not paid in full its outstanding
8  tax obligations to the IRS for the third and fourth quarters of 1996, and the first quarter of 1997.

9       On or about October 29, 1997, Crow resigned from SBN, LLC.

10      On or about November 7, 1997, Walker, on behalf of SBN, LLC, attempted to transfer USLD
11  Warrant No. 23 to USLD as security for certain promissory notes in favor of USLD.  Walker had
12  previously personally guaranteed the promissory notes which were the subject of the transfer, and
13  Walker intended that Warrant No. 23 would secure the promissory notes in place of Walker's personal
14  guarantee.  Warrant No. 23 entitled the bearer to purchase 100,000 shares of USLD common stock
15  at a fixed price.  Despite the purported transfer of Warrant No. 23, Walker testified that SBN, LLC
16  did not control or own Warrant No. 23 on or about November 7, 1997.  Rather, Walker testified that
17  Warrant No. 23 and its rights to 100,000 shares of USLD common stock had been previously
18  transferred from SBN, LLC in equal thirds to Walker, Crow, and Keyes.  Walker testified that he
19  thought he was being "clever" when he assigned to USLD "something that no longer existed and had
20  no value."  Transcript of Bench Trial, Volume 2B at 377.  In return for the purported transfer of
21  Warrant No. 23 to USLD, USLD released Walker from his personal guarantee of certain promissory
22  notes valued at approximately $2,000,0000.

23      On or about November 19, 1997, Walker and Crow entered into an agreement whereby Walker
24  and SBN, LLC, officially purchased Crow's 50% interest in SBN, LLC.  Tr. Ex. 5.  As part of the
25  agreement, Crow received 37,750 USLD warrants and a 50% interest in SBN, Inc.  Tr. Ex. 5 at 2.  The
26  November 19, 1997, Agreement included a global release, however, the global release specifically
27  excepted any claims to contribution and reimbursement which could have arisen between Walker and
28  Crow because of or related to SBN, LLC's outstanding tax liability.  Tr. Ex. 5 at 4.  Notwithstanding

02CV1747 WQH (JMA)

1 the exemption of contribution claims relating to SBN, LLC's outstanding tax liability, the November

2 19, 1997, Agreement provided that, "Walker and SBN (LLC) expressly represent, warrant and

3 covenant to use their best efforts to pay off any contingent tax liability first, specifically the 1996

4 employee taxes." Tr. Ex. 5 at 4.  During his testimony, Walker conceded that he made no effort to pay

5 SBN, LLC's contingent tax liability on or after November 19, 1997, during which time neither Crow

6 nor Keyes had any interest in or involvement with SBN, LLC.

7 　　　　　On or before December 22, 1997, Walker, now in full control of SBN, LLC, assisted USLD

8 in finding evidence that SBN, LLC breached an agreement with USLD.  Walker testified that he spoke

9 with an employee of SBN, LLC, and from that conversation, learned of or found evidence that SBN,

10 LLC breached an agreement with USLD.  Walker then forwarded that information to USLD.

11 　　　　　After Walker admitted that SBN, LLC breached an agreement with USLD, USLD notified

12 Walker and SBN, LLC that,

13 　　　　Because SBN (LLC) has admitted to materially breaching the January 9, 1997
　　　　Telecommunications Agreement by and between SBN (LLC) and USLD, you are

14 　　　　hereby informed that USLD deems original Warrant No. 23, in the name of SBN
　　　　(LLC), terminated and null and void.  This Warrant, of course, had been previously

15 　　　　assigned to USLD as collateral and security for the SBN (LLC) Promissory Notes.

16 Tr. Ex. 202.  USLD agreed to release SBN, LLC from its obligations under the promissory notes

17 valued at $2,000,000, so long as Walker and SBN, LLC agreed to acknowledge that Warrant No. 23

18 was null and void.  On December 22, 1997, Walker, on behalf of SBN, LLC, acknowledged that

19 Warrant No. 23 was null and void, and thereafter USLD released SBN, LLC from its obligations under

20 the promissory notes.  Tr. Ex. 202.  Walker knew that if he assisted USLD in finding a breach, USLD

21 would release SBN, LLC from its obligations under the promissory notes.

22 　　　　　After Walker admitted that SBN, LLC breached its contract with USLD, USLD ceased doing

23 business with SBN, LLC, and cancelled the contract between USLD and SBN, LLC.  Walker knew

24 that SBN, LLC would not be able to pay its outstanding tax liabilities if it ceased doing business.

25 　　　　　On or after December 22, 1997, and immediately after Walker assisted USLD in terminating

26 USLD's contract with SBN, LLC, Walker started a new company known as Walker Direct, and caused

27 Walker Direct to enter into a business agreement with USLD.  Walker Direct performed services for

28 USLD that were similar to those services that SBN, LLC had performed for USLD, and USLD paid

1   Walker Direct approximately $250,000 for those services.  Walker solely owned Walker Direct, and

2   did not use any of the $250,000 to pay SBN, LLC's outstanding tax liabilities.

3       In January 1998, Walker caused SBN, LLC to file for Chapter 7 bankruptcy protection.  Tr.

4   Ex. 4 at 2.

5       On or about December 10, 1998, Keyes purchased SBN, LLC's interest to any and all claims

6   it may have had against USLD from SBN, LLC's bankruptcy trustee.  Tr. Exs. 55-60.

7       In or about December, 1998, the IRS filed a notice of tax lien against Walker with respect to

8   the outstanding tax liability of SBN, LLC, and a penalty pursuant to 26 U.S.C. § 6672 for the tax

9   period ending March 31, 1997.  Tr. Ex. 8 at 3.  On November 8, 2001, Walker challenged the tax lien

10   and penalty by filing a Complaint for review of the tax lien and collection action in the United States

11   District Court for the Southern District of California.  Tr. Ex. 7.

12       On January 17, 2002, and in consideration of Walker's § 6672 tax liability and potential claims

13   to USLD warrants retained by Crow and Keyes, Walker, Crow, and Keyes entered into what is known

14   as the Second Agreement.  Pursuant to the Second Agreement, Crow and Keyes transferred to Walker

15   their rights, title, and interest to SBN, Inc. Claims and SBN, LLC Claims, which included both claims

16   against USLD and USLD warrants.  In return, Walker paid $12,500 to Keyes, and agreed to

17   "indemnify and hold Keyes and Crow harmless from any and all liability claimed, asserted or

18   otherwise sought against either Crow or Keyes by the IRS or any other taxing authority for claims of

19   liability arising from the SBN, LLC or SBN, Inc. operations at any time."  Tr. Ex. 4 at 5.  The Second

20   Agreement also included a provision entitled: "Mutual General Releases between Keyes, Crow, and

21   Walker."  Tr. Ex. 4 at 5.  The "Mutual General Releases between Keyes, Crow, and Walker" provision

22   provided that,

23         Except for the obligations created by this Agreement, this Agreement is intended as
         a global release and settlement of all claims as between all Parties.  Therefore, the
24       Parties do hereby mutually, unconditionally, generally, fully and completely forever
         settle, resolve, release, acquit and discharge each other and opposing counsel of and
25       from present, potential and future claims arising out of the facts, contentions, and
         disputes set forth above, and/or as claimed by the Parties, as well as any and all other
26       present, potential or future claims, of every and any kind and nature whatsoever,
         whether known or unknown, whether suspected or unsuspected, which arise from the
27       facts or circumstances occurring or not occurring up to the date of this Agreement and
         which may have arisen under the laws of any jurisdiction, save for those obligations
28       created by this Agreement.  Such released claims include but are not limited to
         demands; actions; causes of action; suits; rights–contingent, accrued, inchoate, or

1  otherwise; liens; agreements; contracts; promises; covenants; acts; losses; liabilities;
2  obligations; costs; expenses; attorneys' fees; debts; dues; bonds; demands; damages,
   and claims against opposing counsel.  The persons and entities identified in the
3  Paragraph entitled "Binding Agreement" of this Agreement also are specifically
   released, acquitted and discharged of such claims.

4  Tr. Ex. 4 at 5, ¶ 7.  At the time that Walker, Crow, and Keyes entered into the Second Agreement,

5  each party was aware of potential rights to contribution pursuant to 26 U.S.C. § 6672(d).  Walker

6  testified that at the time he signed the Second Agreement, he believed and intended that the Second

7  Agreement was valid and enforceable.  Walker further testified that he would have signed the Second

8  Agreement notwithstanding its enforceability because he wanted to control the SBN, LLC and SBN,

9  Inc. claims which he received under the Second Agreement.

10  On July 1, 2002, the United States answered Walker's Complaint in the United States District

11  Court and Counterclaimed against Walker for additional SBN, LLC tax liabilities in the amount of

12  $257,496.13.  Tr. Ex. 9.

13  On August 6, 2002, Walker recovered $1,250,000 for the claims transferred to him by Crow

14  and Keyes as consideration in the Second Agreement.  Despite having previously promised both Crow

15  and Keyes that he would attempt to pay off SBN, LLC's outstanding tax liabilities, Walker did not use

16  any portion of the $1,250,000 to pay SBN, LLC's outstanding tax liabilities.

17  On September 3, 2002–approximately eight months after signing the January 17, 2002, Second

18  Agreement, and just one month after settling claims recovered under the Second Agreement–Walker

19  filed this Complaint for contribution pursuant to 26 U.S.C. § 6672(d) against Crow and Keyes.

20  Walker did not apprise his lawyer, William Shannahan, of the existence of the January 17, 2002,

21  Agreement signed by Walker, Crow, and Keyes on or before September 3, 2002.  Shannahan learned

22  of the January 17, 2002, Agreement when Keyes called Shannahan sometime after September 3, 2002.

23  On March 24, 2005, Walker settled his tax case with the IRS.  As part of that settlement,

24  Walker paid approximately $320,092.78 to the IRS, and the IRS allocated those funds to SBN, LLC's

25  unpaid tax liabilities for the third and fourth quarters of 1996, and the first quarter of 1997.  The IRS

26  agreed to forgo recovery against Walker for any SBN, LLC tax liabilities for the fourth quarter of

27  1997 as part of that settlement.  Tr. Exs. 12, 14.

28  SBN, LLC was not the only company which Walker controlled which failed to pay taxes on

- 10 -

1  time or was assessed penalties by the IRS pursuant to 26 U.S.C. § 6672.  Walker testified that "at

2  some time some of the taxes were at least late at every company that I've been involved and that I

3  have control over.  I think that's probably a fair statement."  Transcript of Bench Trial, Volume 2B

4  at 337.

5  **CONCLUSIONS OF LAW**

6  The sole issue before the Court is whether Crow and Keyes are liable to Walker for

7  contribution pursuant to 26 U.S.C. § 6672(d).  Walker contends that Crow and Keyes are liable for

8  contribution because (1) Crow and Keyes are responsible persons under 26 U.S.C. § 6672, and (2) the

9  release and indemnity provisions of the First and Second Agreements are void as against public policy.

10  Specifically, Walker contends that Crow and Keyes are responsible persons pursuant to 26 U.S.C. §

11  6672 because they served as managers of SBN, LLC, and at certain times, assisted in the hiring and

12  firing of employees and the management of the company.  Walker concedes that he signed the Second

13  Agreement with the intent to release claims of contribution, however, Walker contends that the release

14  provisions of the Second Agreement are nevertheless unenforceable as violating public policy.

15  Crow and Keyes contend that they are not liable for contribution because Walker specifically

16  released and waived such claims in the Second Agreement, and because neither Crow nor Keyes is

17  a responsible person pursuant to 26 U.S.C. § 6672.  Crow and Keyes assert that they were passive

18  investors in SBN, LLC up to and until early March, 1997, and only accepted greater roles after that

19  time to remedy damage to SBN, LLC caused by Walker.  Crow and Keyes contend that the release

20  provisions contained in the Second Agreement are enforceable as a matter of law and that no public

21  policy renders those provisions unenforceable.

22  In order for Walker to prevail on his claim for contribution in this trial to the Court, it is

23  Walker's burden to establish that Crow and Keyes are responsible persons pursuant to 26 U.S.C. §

24  6672, and that the release provisions contained in the First and Second Agreement are unenforceable

25  as against public policy.  As detailed below, the Court finds the release provisions contained in the

26  First and Second Agreements enforceable, and therefore, it is unnecessary for the Court to determine

27  whether and if Crow and Keyes are responsible persons pursuant to 26 U.S.C. § 6672.

28  **I. The Enforceability of the Release Provisions Contained in the First and Second Agreements**

1       The May 1, 1997, First Agreement, signed by Walker, Crow, and Keyes, contained the

2   following release provision:

3           With the exception of obligations arising from and reserved in this Agreement,
            KEYES and the KEYES FAMILY TRUST, on the one hand, and SBN (LLC),
4           WALKER, CROW, and PGT, on the other, release and forever discharge each other,
            their general partners, employees, agents, representatives, successors, assigns,
5           attorneys, accountants, and officers, of and from any and all claims, actions, causes of
            action of every kind in law and equity, suits, debts, liens, contracts, agreements,
6           obligations, promises, demands, liabilities, damages, loss, costs and expenses of any
            nature whatsoever, known or unknown, fixed or contingent, real or imagined, in
7           existence at the time of execution of this Agreement, arising from the formation,
            investment in, operation and management of SBN (LLC).
8
    Tr. Ex. 3 at 7.  The January 17, 2002, Second Agreement, signed by Walker, Crow, and Keyes,
9
    contained a release provision which provided that:
10
            Except for the obligations created by this Agreement, this Agreement is intended as
11          a global release and settlement of all claims as between all Parties.  Therefore, the
            Parties do hereby mutually, unconditionally, generally, fully and completely forever
12          settle, resolve, release, acquit and discharge each other and opposing counsel of and
            from present, potential and future claims arising out of the facts, contentions, and
13          disputes set forth above, and/or as claimed by the Parties, as well as any and all other
            present, potential or future claims, of every and any kind and nature whatsoever,
14          whether known or unknown, whether suspected or unsuspected, which arise from the
            facts or circumstances occurring or not occurring up to the date of this Agreement and
15          which may have arisen under the laws of any jurisdiction, save for those obligations
            created by this Agreement.  Such released claims include but are not limited to
16          demands; actions; causes of action; suits; rights–contingent, accrued, inchoate, or
            otherwise; liens; agreements; contracts; promises; covenants; acts; losses; liabilities;
17          obligations; costs; expenses; attorneys' fees; debts; dues; bonds; demands; damages,
            and claims against opposing counsel.  The persons and entities identified in the
18          Paragraph entitled "Binding Agreement" of this Agreement also are specifically
            released, acquitted and discharged of such claims.
19
    Tr. Ex. 4 at 5.  The evidence submitted at trial establishes that Walker, Crow, and Keyes each intended
20
    the First and Second Agreements to be valid and enforceable contracts, and that both Agreements were
21
    supported by adequate consideration.  The evidence further establishes that Walker, Crow, and Keyes
22
    were aware of potential rights to contribution pursuant to 26 U.S.C. § 6672(d) before signing the
23
    Second Agreement, and each intended to release such claims by signing the Second Agreement.
24
            Notwithstanding Walker's intention to release claims of contribution pursuant to the Second
25
    Agreement, Walker contends that the release provisions of the Second Agreement are unenforceable
26
    as against public policy.  Walker contends that Congress adopted 26 U.S.C. § 6672(d) to protect the
27
    public interest, and that the rights created in 26 U.S.C. § 6672(d) cannot be released by private
28
    agreement. Walker contends that the First and Second Agreements are "illegal" contracts to the extent

                                        - 12 -                          02CV1747 WQH (JMA)

1   that the Agreements authorize the release of claims pursuant to 26 U.S.C. § 6672(d).  Walker cites

2   California Civil Code §§ 1542 and 3513, and contends that those statutes further render the First and

3   Second Agreements' release provisions unenforceable in this case.

4        Crow and Keyes contend that the First and Second Agreements are private agreements which

5   do not impact upon the public interest.  Crow and Keyes contend that there is no public policy which

6   renders the release provisions unenforceable.  Crow and Keyes further contend that public policy

7   favors enforcing the First and Second Agreements.  Crow and Keyes assert that Walker signed the

8   First and Second Agreements knowing that he was releasing claims to contribution, and that Walker

9   received valuable consideration for releasing those claims.  Crow and Keyes assert that Walker was

10  solely responsible for SBN, LLC's outstanding tax liabilities, failed to pay those tax liabilities despite

11  promising Crow and Keyes that he would do so, and forced SBN, LLC into bankruptcy by

12  orchestrating a breach of contract by SBN, LLC so that Walker could channel business and profits to

13  Walker's new company, Walker Direct.  In light of Walker's conduct, Crow and Keyes contend that

14  public policy favors enforcing the release provisions of the First and Second Agreement, which were

15  signed and intended by all parties to release the specific claim asserted by Walker in this case.

16       "It is well established that federal common law properly is invoked to determine the validity

17  of a release of a statutorily-conferred federal right." *United States v. Northrup*, 59 F.3d 953, 960 (9th

18  Cir. 1995).  In order to determine whether a release provision is enforceable in light of public policy

19  concerns, a court is required "(1) to determine whether the agreement waives a right that impacts upon

20  the public interest; (2) determine whether a *substantial* public interest would be impaired by

21  enforcement of the agreement; and (3) to ascertain the reasons apart from the general interest in

22  settling disputes that support enforcing the agreement."  *Id*. at 962; *see also Town of Newton v.*

23  *Rumery*, 480 U.S. 386, 392 (1987); *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1396-

24  99 (9th Cir. 1991).  The policy "favoring enforcement of private agreements and the encouragement

25  of settling litigation . . . is admittedly important."  *Davies*, 930 F.2d at 1398.  Accordingly, "[i]n a case

26  presenting no public interest that would be harmed by enforcement of the waiver provision, the

27  countervailing interest in settlement will be enough to justify enforcement."  *Id*.  Where there is a

28  public interest in non-enforcement, but the interest is not "substantial," a court considers "all the

- 13 -                                              02CV1747 WQH (JMA)

1   factors that bear on whether 'the public interest in enforcement of the agreement outweigh[s] the

2   policies furthered by non-enforcement.'" *Northrup*, 59 F.3d at 962 (citing *Davies*, 930 F.2d at 1396).

3   /

4

5   ### A. Whether the Release Provisions of the First and Second Agreements Waive Rights that Impact Upon the Public Interest

6

7   The first question before the Court is whether the release provisions of the First and Second

    Agreements "[waive rights] that [impact] upon the public interest." *Northrup*, 59 F.3d at 962.
8
    Walker contends that Congress enacted 26 U.S.C. § 6672(d) for a public purpose and to
9
    promote the public's interest in the uniform and fair administration of tax laws.  Walker contends that
10
    Congress did not intend for parties to be able to allocate or circumvent liability for the tax penalty
11
    under 26 U.S.C. § 6672(a) through prearranged contractual agreements.  In support of his public
12
    policy argument, Walker cites to 26 U.S.C. § 6672(d)'s Legislative history, and specifically a
13
    "Reasons for change" provision which appears therein.  The "Reasons for change" provision states
14
    in pertinent part that:
15
16          The IRS may collect [the penalty under 6672(a)] from a responsible person from whom
            it can collect most easily, rather than from the person with the greatest culpability for
            the failure.  It would accordingly promote fairness in the administrative of the tax laws
17          to establish a right of contribution among multiple responsible persons.

18  1996 U.S. Code Congressional and Administrative News, 104th Congress, Second Session at 1163.

19  Walker contends that the Congress' statement concerning fairness in the administration of the tax laws

20  establishes that the release provisions of the First and Second Agreements impact upon the public

21  interest.

22  Crow and Keyes contend that there is no public interest impacted when a private party releases

23  a claim to contribution otherwise available pursuant to 26 U.S.C. § 6672(d).  Crow and Keyes contend

24  that by paying consideration to Walker for his release of claims of contribution, Crow and Keyes

25  effectively paid in advance any share of Walker's potential tax liability for which they may have been

26  responsible.

27  The enactment of 26 U.S.C. § 6672(d) and its creation of a federal statutory right of

28  contribution promoted fairness in the administration of the tax laws.  However, Walker has not

1   presented any evidence of or established that Walker's knowing release of the right to contribution

2   created by 26 U.S.C. § 6672(d) impacts upon the public interest under the facts of this case. While

3   allowing for a right of contribution promotes fairness in the administration of the tax laws, releasing

4   a claim for contribution for consideration in a private agreement does not undermine fairness in the

5   administration of the tax laws. In this case, Walker received valuable consideration worth

6   approximately $1,250,000 for releasing and settling a claim to contribution, and fairness requires

7   enforcing the release of the contribution claim.

8        Walker supports his public interest arguments by citing *Cook v. United States*, 765 F. Supp.

9   217 (M.D. Penn. 1991), and *Rebelle v. United States*, 588 F. Supp. 49 (M.D. La 1984), and notes that

10   both cases cite public policy considerations in discussions concerning rights of contribution. The

11   question before the courts in both *Cook* and *Rebelle* was whether federal common law as it existed

12   before 1996 included a right to contribution for penalties assessed pursuant to 26 U.S.C. § 6672(a).

13   *See Cook*, 765 F. Supp. at 219-20; *Rebelle*, 588 F. Supp. at 51. After examining public policy

14   concerns cited by the parties in each case, *Cook* and *Rebelle* concluded that there were important

15   public policy interests which supported the conclusion that there was no federal statutory right to

16   contribution. *Cook* and *Rebelle* did not involve any public interest impacted by the release of a claim

17   to contribution, and therefore, the policy concerns cited in those cases have no relevance to the facts

18   of this case. After reviewing *Cook* and *Rebelle*, the Court finds that neither case is relevant to the facts

19   as presented in this case.

20        It is well established that the fundamental purpose of 26 U.S.C. § 6672 is "[t]o protect the

21   government from losses sustained by employers' failure to remit withholding taxes . . . ." *Fiataruolo*

22   *v. United States*, 8 F.3d 930, 938 (2d Cir. 1993); *see also Purcell v. United States*, 1 F.3d 932, 936 (9th

23   Cir. 1993); *Davis v. United States*, 961 F.2d 867, 869 (9th Cir. 1992); *Monday v. United States*, 421

24   F.2d 1210, 1216 (7th Cir. 1970). Walker has not shown, however, that by releasing his claim to

25   contribution the government was unable to or prejudiced in seeking to collect on outstanding taxes.

26   Neither the First or Second Agreements' release provisions affected or impacted the United States'

27   ability to seek penalties pursuant to 26 U.S.C. § 6672(a) against Walker, Crow, or Keyes. Under the

28   facts of this case, the Court concludes that government's interest in collecting taxes is not impacted.

1    In addition to his other arguments, Walker relies upon California Civil Code §§ 1542 and 3512

2  to support his contention that the release provisions contained in the First and Second Agreements are

3  unenforceable and impact the public interest.  However, the Court finds both statutes inapplicable

4  because (1) Walker knew about his right to contribution before he signed the Second Agreement, and

5  (2) Walker has not established that 26 U.S.C. § 6672(d) was established for a public reason as opposed

6  to for Walker's benefit. CAL. CIV. CODE §§ 1542, 3512.

7    The Court finds that the release provisions in this case do not impact upon the public interest.

8  Walker knew that he possessed claims to contribution before signing the Second Agreement, and

9  Crow and Keyes transferred valuable consideration to Walker to secure Walker's agreement to release

10  Crow and Keyes from those claims.  Under the facts of this case, the Court concludes that the only

11  public interest at stake under the first prong of *Northrup* is the public interest in favor of enforcing

12  private settlement agreements.  *Davies*, 930 F.2d at 1398; *Northrup*, 59 F.3d at 962-63, 969.  The

13  Court concludes that the release provisions contained in the First and Second Agreements do not

14  violate public policy.

**B. Even Assuming There Were a Public Interest Impacted by Enforcing the Release Provisions At Issue Here, Such an Interest Would not be Substantial, and the Facts of This Case Strongly Favor Enforcement of the Release Provisions**

17    The Court concludes that enforcement of the release provisions contained in the First and

18  Second Agreements does not impact upon the public interest.  However, even assuming there was a

19  public interest impacted in enforcing the Agreements, Walker does not prevail under either the second

20  or third prongs of the *Northrup* analysis.

21    If a court finds that a release provision impacts upon the public interest, the court must then

22  determine whether the impact upon the public interest is "substantial," and if it is not, consider "all

23  the factors that bear on whether 'the public interest in enforcement of the agreement outweigh[s] the

24  policies furthered by non-enforcement.'" *Northrup*, 59 F.3d at 962 (citing *Davies*, 930 F.2d at 1396).

25    Assuming a minimal public interest in ensuring fairness in the administration of the tax laws

26  is impacted by enforcing the release provisions contained in the First and Second Agreements, the

27  question becomes whether the public interest in enforcing the release provisions in the First and

28  Second Agreements outweighs the policies furthered by not enforcing the release provisions.

1    *Northrup*, 59 F.3d at 962.  There are substantial reasons for enforcing the release provisions in the

2    First and Second Agreements under the facts of this case.  First, Walker, Crow, and Keyes knowingly,

3    voluntarily, and intelligently signed both the First and Second Agreements, and each intended and

4    expected that claims to contribution, which each knew existed, would be released.  *See Davies*, 930

5    F.2d at 1394-96 (even certain constitutional rights, which require a stricter analysis than the release

6    of statutory rights, can be waived and released if the waiver is voluntary, knowing, and intelligent).

7    Second, Walker, Crow, and Keyes intended the First and Second Agreements to be an expansive

8    settlement of all existing and future claims then before the parties, and the Court finds that there is a

9    well established and important policy interest favoring enforcement of private agreements and

10   settlement of litigation.  *Davies*, 930 F.2d 1390, 1398 (citing *Kiddie Rides, Inc. v. Southland

11   Engineering, Inc.*, 361 F.2d 575 (9th Cir. 1966)).  Third, Walker promised Crow and Keyes that he

12   would use his best efforts to pay SBN, LLC's outstanding tax liabilities, yet, despite receiving

13   consideration for those promises, Walker subsequently forced SBN, LLC out of business by

14   concocting a breach which Walker knew would prevent SBN, LLC from paying the outstanding tax

15   liabilities.  Finally, the facts establish that Walker controlled, managed, and operated SBN, LLC

16   during those periods in which the substantial portion of SBN, LLC's tax liabilities accrued, and

17   further, that Walker manipulated SBN, LLC's contracts and third-party relationships to Walker's sole

18   benefit, and to the detriment of SBN, LLC, Crow, and Keyes.  The Court finds that these facts weigh

19   heavily in favor of enforcing the release provisions.  Crow and Keyes entered into the Second

20   Agreement with full knowledge of all material facts, and transferred valuable consideration to Walker

21   to secure their respective releases from any and all claims against them which may have arisen

22   because of Walker's actions in managing SBN, LLC.

23          After reviewing the parties' arguments, the Court concludes that even assuming some minimal

24   public interest affected in enforcing the release provisions of the First and Second Agreements, the

25   public interest in enforcement strongly favors, and ultimately requires enforcement of the release

26   provisions.   Under the facts of this case, there are substantial reasons for enforcing the private

27   agreements, and almost none for declaring it unenforceable.  Accordingly, the Court finds that the

28   release provisions of the First and Second Agreements are enforceable and do not violate public

02CV1747 WQH (JMA)

1 policy.  Furthermore, and applying the plain and clear terms of the First and Second Agreements, the

2 Court concludes that Walker is not entitled to contribution pursuant to 26 U.S.C. § 6672(d) because

3 Walker released those claims under the First and Second Agreements.

4

5 **CONCLUSION**

6       After hearing the testimony and exhibits presented in this trial to the Court, and after reviewing

7 the parties' arguments and post-trial briefs, the Court concludes that Crow and Keyes are entitled to

8 judgment in their favor on Walker's claim to contribution pursuant to 26 U.S.C. § 6672(d).

9       **IT IS SO ORDERED**.

10 DATED:  October 19, 2007

11
                                **WILLIAM Q. HAYES**
12                              United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28